IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA,        )        **Case No. 3:19-cr-00158-N-1**
                                 )
            Plaintiff,           )
                                 )        Dallas, Texas
v.                               )        March 8, 2019
                                 )        2:00 p.m.
TYJUAN TRUDUNTE CLARK,           )
                                 )        PRELIMINARY HEARING
            Defendant.           )        DETENTION HEARING
_____ )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE IRMA CARRILLO RAMIREZ,
UNITED STATES MAGISTRATE JUDGE.

APPEARANCES:

For the Government:          Phelesa Guy
                             UNITED STATES ATTORNEY'S OFFICE
                             1100 Commerce Street, 3rd Floor
                             Dallas, TX  75242-1699
                             (214) 659-8600

For the Defendant:           Marti Morgan
                             FEDERAL PUBLIC DEFENDER'S OFFICE
                             525 Griffin Street, Suite 629
                             Dallas, TX  75202
                             (214) 767-2746

Court Recorder:              Marie Castañeda
                             UNITED STATES DISTRICT COURT
                             1100 Commerce Street, Room 1452
                             Dallas, TX  75242-1003
                             (214) 753-2167

Transcription Service:       Kathy Rehling
                             311 Paradise Cove
                             Shady Shores, TX  76208
                             (972) 786-3063

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          DALLAS, TEXAS - MARCH 8, 2019 - 2:43 P.M.

2               THE COURT:  All right.  Are we going forward on Mr.

3  Clark?

4               MS. MORGAN:  Yes, Your Honor.

5               THE COURT:  Okay.  All right.  You may call your

6  first witness.

7               MS. GUY:  Phelesa Guy for the Government, Your Honor,

8  and I'd call Derek Hubert at this time.

9               THE COURT:  And, sir, if you would raise your right

10  hand.

11            DEREK HUBERT, GOVERNMENT'S WITNESS, SWORN

12               THE COURT:  Please be seated.  And we're going

13  forward on probable cause and detention; is that correct?

14               MS. MORGAN:  Correct, Your Honor.

15               MS. GUY:  Yes, Your Honor.

16               THE COURT:  All right.  You may proceed.

17               MS. GUY:  Thank you, Your Honor.

18                        DIRECT EXAMINATION

19  BY MS. GUY:

20  Q    Can you state your full name for the record?

21  A    Derek Hubert.

22  Q    Can you spell your last name, please?

23  A    H-U-B-E-R-T.

24  Q    How are you employed?

25  A    With Homeland Security Investigations.

Hubert - Direct                         3

1    Q    How long have you worked for Homeland Security?

2    A    Approximately 15 years.

3    Q    What are some of your duties with Homeland Security?

4    A    I'm currently assigned to the High Intensity Drug

5    Trafficking Area unit.

6    Q    What is your official title?

7    A    Special agent.

8    Q    And were you involved in the investigation of Tyjuan

9    Clark?

10   A    Yes, ma'am.

11   Q    And are you aware if there's a complaint on file in the

12   case against him?

13   A    Yes, ma'am.

14   Q    It charges him with conspiracy to possess with the intent

15   to distribute and distribute a controlled substance -- to wit,

16   Fentanyl.

17   A    Yes, ma'am.

18   Q    Are you aware of that?

19   A    Yes, ma'am.

20   Q    Are you familiar with the facts of that investigation?

21   A    Yes, ma'am.

22   Q    Can you tell the Court briefly how he was involved in that

23   offense?

24   A    On Tuesday, March 5th of this week, we executed a federal

25   search warrant at his residence on Marsalis Drive.  During the

Hubert - Direct                                4

1   course of the search warrant, we discovered a large amount of

2   pills and currency.  The pills were located outside the

3   residence in a vehicle, and some of the currency was located

4   in the residence.

5        Upon testing the pills, we learned that a majority of them

6   tested positive for the properties of Fentanyl.

7   Q    And is Fentanyl a controlled substance?

8   A    It is.

9   Q    And you indicated that the house was on Marsalis?

10  A    Yes.

11  Q    Is that within the Northern District of Texas?

12  A    It is.

13  Q    And you indicated that money was found.  Do you know how

14  much money was found?

15  A    We do not at this time.

16  Q    And any other drug paraphernalia or drugs found?

17  A    Well, yes, there were some other pills discovered, and

18  they're suspected of being Ecstasy and possibly Adderall.

19  Q    Okay.  What about drug paraphernalia or packaging?

20  A    We did find -- or, I did see some small drug scales used

21  for weighing drugs.

22  Q    Okay.  Is that a house or an apartment?

23  A    It's a single-family house.

24  Q    And who was living there?

25  A    At the time, it was Mr. Clark; Mrs. Clark, his wife; and

Hubert - Direct                           5

1   their children.

2   Q    And what are the ages of the children, or thereabout?

3   A    Approximately 16, and then the youngest daughter I believe

4   is five, six years old.

5   Q    And were these kids at the house on the date of the search

6   warrant?

7   A    The daughter was.  The son had been brought to school.

8   Q    Okay.  Was Mr. Clark arrested on that date?

9   A    He was.

10  Q    And was he arrested for the charge that is listed in the

11  complaint?

12  A    He was.

13  Q    At the time of his arrest, or thereafter, did he make any

14  statement?

15  A    He did.

16  Q    Was he given his Miranda warning prior to making any

17  statement?

18  A    Yes, ma'am.

19  Q    Did he agree to waive those rights and speak with the

20  police?

21  A    Yes, ma'am.

22  Q    Did he make any incriminating statements?

23  A    He did.

24  Q    What did he state?

25  A    He said the pills they found -- we discovered were his,

Hubert - Direct                                    6

1    and they were his for resale.

2    Q    Did he indicate how much he was selling these pills for?

3    A    $4 a pill.

4    Q    And how many pills were found?

5    A    The ones that we believe are -- contain Fentanyl, a little

6    over 8,000.

7    Q    And what is Fentanyl?

8    A    Fentanyl is highly-powerful opioids.  It's the -- whenever

9    I see it in the news right now, it is involved in most of the

10   overdoses.

11   Q    So people can die from this?

12   A    Yes, they can.

13   Q    Are you familiar with his criminal history?

14   A    I am.

15   Q    And does he have any criminal convictions?

16   A    He does.

17   Q    Do you know what type of offenses?

18   A    It ranges from possession of a controlled substance,

19   evading arrest, to tampering with a Government document.

20   Q    Do you know if he's on probation right now?

21   A    From review of his criminal history, yes, ma'am.

22   Q    Do you know what type of offense he's on probation for?

23   A    I believe it was evading arrest and -- no, possession and

24   the tampering with a document.

25   Q    I believe it's evading and tampering.

Hubert - Direct                    7

1    A    Evading and tampering.   Okay.

2    Q    Okay.   And do you have concerns about him being a danger

3    to the community?

4    A    Yes, ma'am.

5    Q    What are your concerns?

6    A    With that large amount of pills and with the -- being not

7    quality-controlled, not being done by a pharmacy, it's very

8    likely that someone could die from one of those pills and

9    overdose.

10            MS. MORGAN:   Objection.   Lack of foundation.

11            THE COURT:   Overruled.

12            MS. MORGAN:   Expert opinion.

13            THE COURT:   Overruled.

14   BY MS. GUY:

15   Q    Any other concerns about him being a danger to the

16   community?

17   A    No, ma'am.

18   Q    Other than the criminal history that you've --

19   A    Other than criminal history and the large amount of pills

20   found at his house.

21   Q    Okay.

22            MS. GUY:   Pass the witness.

23            THE COURT:   Ms. Morgan?

24                      CROSS-EXAMINATION

25   BY MS. MORGAN:

Hubert - Cross                                                  8

1    Q     All right.  So, there were no pills found in the home,

2    correct?

3    A     Not to my knowledge.

4    Q     Okay.  No sort of drug paraphernalia or drugs in the home?

5    A     The scales.

6    Q     Oh, there were scales?

7    A     Yes.

8    Q     Okay.

9    A     Like weighing scales.

10   Q     Okay.  But no -- no pills?

11   A     No.  We did not find the cocaine that he said was in the

12   house.

13   Q     Okay.  So, no drugs in the house?

14   A     No.

15   Q     Okay.  The car that you found the pills in, that was

16   parked in the driveway?

17   A     Yes, ma'am.

18   Q     All right.  And within the car, the pills were found

19   inside of a backpack?

20   A     Yes, ma'am.

21   Q     And where was the backpack located?

22   A     The passenger area.

23   Q     Okay.  Did you take photographs?

24   A     There was photographs taken.  I did not.

25   Q     Okay.  Were you present for the search?

Hubert - Cross                              9

1    A    Yes.

2    Q    Okay.  Were you present when Mr. Clark was spoken with

3    after his arrest?

4    A    No, ma'am.

5    Q    Okay.  Do you know whether that conversation was recorded?

6    A    I do not.

7    Q    So, all of that information you're testifying to is second

8    or third-hand information at this point?

9    A    Yes, ma'am.

10   Q    Okay.  All right.  And I believe you testified that he's

11   on probation for tampering with a Government document.  Isn't

12   it actually tampering with physical evidence?

13   A    I just reviewed the criminal history.  That's what it said

14   on there.  It wasn't a complete --

15   Q    When you say the criminal history, what it said on there,

16   --

17   A    When --

18   Q    -- what's on there?

19   A    When we print it, when they get the printout, a lot of

20   it's abbreviated, so it'll be Tampering/GOV/ -- it's not a

21   full printout.

22   Q    Okay.  So you don't actually know specifically?  It was

23   just some sort of tampering?

24   A    Some sort.  Yes, ma'am.

25   Q    Okay.  And it was with physical objects as opposed to like

Hubert - Cross                                10

1    a witness?

2    A    To my understanding, yes.

3    Q    Okay.  All right.  And you guys took all the pills, right?

4    A    I believe so, yes.

5    Q    Okay.  So there are no more pills in the car, in the

6    house?  Nothing like that?

7    A    I can't say for sure.

8    Q    Well, you looked, though?

9    A    We did.

10   Q    Okay.  And you do this as your job every day?

11   A    Yes.

12   Q    Okay.  So you're pretty thorough?

13   A    Yes, ma'am.

14   Q    And you're pretty good at knowing where to look?

15   A    We are.

16   Q    All right.  And you guys actually took the car, right?

17   A    Yes.

18   Q    Okay.

19          MS. MORGAN:  I'm sorry.  One second.

20       (Pause.)

21   BY MS. MORGAN:

22   Q    And Mr. Clark's youngest daughter, I actually believe is

23   about three years old.  Does that sound --

24   A    Okay.  She could be.

25   Q    Okay.  And she's -- did you -- did you actually see her?

1   A    We did.

2   Q    Okay.  You saw that she has Down Syndrome?

3   A    I couldn't say.

4              THE DEFENDANT:  I told 'em.

5              MS. MORGAN:  One moment.

6   BY MS. MORGAN:

7   Q    All right.  So you weren't able to tell --

8   A    As far as what type.  I just could -- was informed she had

9   some sort of mental illness, but I couldn't speak to exactly

10  what it was.

11  Q    Okay.  So you could tell that she had some developmental

12  issues?

13  A    Yes, ma'am.

14  Q    Okay.  All right.  Oh, you said that a majority of pills.

15  Now, there are, you said, about 8,000 pills?

16  A    There's a little over 8,000 suspected of having Fentanyl.

17  Q    Okay.  And I believe on direct you said that a majority of

18  the pills contain Fentanyl?

19  A    Yes.  Because there were others that were picked up or

20  that were seized, the ones relating to Ecstasy and Adderall,

21  that we did not get them analyzed yet for Fentanyl.

22  Q    Okay.  And I noted when I read the affidavit from earlier

23  this week, it looked like three pills had been tested.

24  A    Yes.

25  Q    Okay.  So when you say a majority of the pills, you're

1   extrapolating that from the three pills that were tested?

2   A    Because those pills were taken from the specific types of

3   -- the three that were tested, the large one would be the

4   white ones with the M367 logo on them, so we took one of those

5   out of the largest amount of those, had that tested.  Then we

6   had one from the two that were all in the same, in the same

7   pills, had those tested.  And no, we did not take all the

8   pills at the same time.

9   Q    Okay.  It was just a little bit confusing to me, the way

10  you said --

11  A    Oh.

12  Q    -- the majority of the pills, --

13  A    Okay.

14  Q    -- as though they had been tested.

15  A    Okay.

16  Q    Okay.  All right.  So you guys tested three pills?

17  A    Yes, ma'am.

18  Q    All right.  And they tested positive for Fentanyl?

19  A    For the properties of Fentanyl, yes, ma'am.

20  Q    Okay.

21           MS. MORGAN:  All right.  Nothing further.

22           THE COURT:  Anything else, Ms. Guy?

23           MS. GUY:  Just two questions, Your Honor.

24                    REDIRECT EXAMINATION

25  BY MS. GUY:

                             Hubert - Redirect                      13

1   Q    On cross-examination, you said you didn't find the cocaine

2   that was in the house?

3   A    Yes.

4   Q    What cocaine?

5   A    When we were at the house, it was relayed to me that Mr.

6   Clark was saying the only thing that would be in the house

7   would be some cocaine.

8   Q    And you say you didn't find it, though?

9   A    No, we did not.

10  Q    Do you see Mr. Clark in court today?

11  A    I do.

12  Q    Can you point to him and describe what he's wearing?

13  A    At the defense table wearing the yellow prison outfit.

14          MS. GUY:  Your Honor, may the record reflect that the

15  witness has identified the Defendant?

16          THE COURT:  The record will so reflect.

17          MS. GUY:  That's all I have, Your Honor.

18          THE COURT:  Anything else, Ms. Morgan?

19          MS. MORGAN:  Just very --

20                      RECROSS-EXAMINATION

21  BY MS. MORGAN:

22  Q    You, you never heard Mr. Clark say anything about cocaine?

23  A    Did I?

24  Q    Right.

25  A    Yes.

Hubert - Recross                        14

1   Q    You, you heard Mr. Clark say something about having

2   cocaine?  Or you --

3   A    Yes.

4   Q    Or you were told that by another officer?

5   A    No, I heard him say there was cocaine in the house.  He

6   wasn't talking to me, but I heard him say --

7   Q    Okay.  All right.

8              MS. MORGAN:  Nothing further.

9              THE COURT:  You may step down.  Thank you very much.

10        (The witness steps down.)

11             THE COURT:  Any other witnesses, Ms. Guy?

12             MS. GUY:  No other witness, Your Honor, but I would

13   ask that the Court take judicial notice of the complaint

14   that's on file in this case.

15             THE COURT:  Ms. Morgan, any witnesses or proffer on

16   behalf of Mr. Clark?

17             MS. MORGAN:  Yes, Your Honor.  The Defense would call

18   Mr. Clark's wife, Leunie Clark.

19             THE COURT:  All right.  And, ma'am, if you would come

20   over to the witness chair.  And if you'll stop and face me and

21   raise your right hand.

22              LEUNIE CLARK, DEFENDANT'S WITNESS, SWORN

23             THE COURT:  All right.  Please be seated, and please

24   speak up into the microphone.

25                          DIRECT EXAMINATION

1    BY MS MORGAN:

2    Q    Good afternoon.

3    A    Good afternoon.

4    Q    Would you please state your name for the record?

5    A    My name is Leunie Deshune Clark.

6    Q    And would you please spell that?

7    A    L-E-U-N-I-E D-E-S-H-U-N-E C-L-A-R-K.

8    Q    All right.  And how do you know Mr. Clark?

9    A    We're married.

10   Q    How long have you known him?

11   A    Over twenty-something years.

12   Q    And how long have the two of you been in a romantic

13   relationship?

14   A    Basically twenty-something years.

15   Q    Okay.  And how many children do the two of you have

16   together?

17   A    We have two.

18   Q    Okay.  And how old is your oldest?

19   A    Fifteen.

20   Q    What's his name?

21   A    Tyjuan Clark, Jr.

22   Q    All right.  And your youngest?

23   A    Tyana (phonetic).  She's three.

24   Q    Okay.  And then how many children do you actually have?

25   A    Three.

1   Q    Okay.  And the -- your third is the oldest?

2   A    Yes.

3   Q    What's his name?

4   A    Tamaya Howard Williams (phonetic).

5   Q    Okay.  And how old is he?

6   A    He's 21.

7   Q    Has Mr. Clark played a role in your eldest son's life?

8   A    Yes.  He has helped me raise my son since he was three

9   years old.

10  Q    Okay.  So is he Dad --

11  A    Yes.

12  Q    -- to all --

13  A    Yes.

14  Q    -- three children?

15  A    Yes.

16  Q    Okay.  All right.  And you and Mr. Clark live together,

17  correct?

18  A    Yes.

19  Q    How long have you all lived in that house?

20  A    Thirteen years.

21  Q    All right.  And if you know, how long has Mr. Clark lived

22  in Dallas?

23  A    Like all his life, I guess.

24  Q    Okay.  That's where he was born?

25  A    Uh-huh.

L. Clark - Direct                              17

1    Q    Yes?

2    A    Yes.

3    Q    Okay.  And how about the rest of his family, his mom and

4    his grandma, his aunts, all those people?

5    A    They're from Dallas.

6    Q    Okay.  Do they all live in Dallas?

7    A    Yes.

8    Q    Okay.  All right.  So all of his ties are here, local?

9    A    Yes.

10   Q    Do you know whether he has a passport?

11   A    No, he doesn't.

12   Q    He doesn't?  All right.  Now, I'd like to talk a little

13   bit about your daughter.

14   A    Uh-huh.

15   Q    You said she's three?

16   A    Yes.

17   Q    And would you tell the Court a little bit about her?

18   A    Tyana, she's three years old.  She was diagnosed with Down

19   Syndrome in two thousand and -- November the 23rd, 2015, when

20   I had her.  She's never been without her father.  All she know

21   is me and her father.  She -- like, now, he's not around, so

22   she can tell, so she kind of like acts in a certain manner

23   where she's kind of like withdrawn.

24        I don't know if you all can understand had Down Syndrome

25   kids work, but they're only familiar with their surroundings.

1    Anything else beyond their surroundings, they're not going to

2    take well to.  So by the absence of her father not being

3    around, it makes her more irritated, more, you know, subdued,

4    to act out, or, you know, just not cooperate, period, because

5    she's -- she's more closer to her father than she is to me.

6    He's the one that takes her to school.  He's the one that sits

7    in the school and volunteers with the teacher to help assist

8    with Tyana.

9    Q    Okay.  I'm going to stop you for just a second.  All

10   right.  So is it fair to say that Tyjuan is her person?

11   A    Yes.

12   Q    Okay.  And is she -- does -- is she verbal?  Does she

13   speak yet?

14   A    No, she cannot speak.

15   Q    Okay.  So she's still pre-verbal?

16   A    Right.

17   Q    All right.  And I know you said he takes her to school,

18   correct?

19   A    Yes.

20   Q    I know he -- well, I guess let's do this in order.  Tyjuan

21   recently lost his job after having the flu, right?

22   A    Correct.

23   Q    Where had he been working?

24   A    Merritt Landscaping or something like that.  I really

25   don't know the last part of it, because he was only there for

1    maybe like two weeks.

2    Q    Okay.

3    A    Yeah, he caught the flu the second week.  Initially, the

4    flu began with my daughter, who passed it on to me, who I

5    passed it on to him.

6    Q    Okay.  All right.  And before he got that job, he had been

7    on a period of dis -- of --

8    A    Um, --

9    Q    -- unemployment?

10   A    Yes, ma'am.

11   Q    Okay.  And during that period of unemployment, he'd been

12   able to take your daughter to school?

13   A    Right.  Correct.

14   Q    And when he took her to school, do you know whether he

15   would stay and help out in the classroom?

16   A    Yes, he would.

17   Q    Do you know what sorts of things he did there in the

18   classroom?

19   A    Feeding, reading, just anything that the teacher needs

20   done so far as with the other children, because it's multiple

21   children in the classroom.

22   Q    Right.

23   A    So at the time when you come in, you have to volunteer a

24   certain -- you have to volunteer seven hours within a month.

25   So you at least have to be there at least 30 minutes at least.

1   You know, you have a sign-in sheet that you have to sign in

2   and sign out of.

3   Q    Okay.  And he was doing all of that?

4   A    Yes.

5   Q    Okay.  And what school does she go to?

6   A    She goes to West Dallas Child Care Center.  It --

7   originally, it was considered Bach, Early Head Start, but they

8   moved from one area to another so they switched the name.

9   Q    Okay.  All right.  And I know your oldest is a young

10  adult, but your middle son -- sorry, I'm --

11  A    Tyjuan.

12  Q    Tyjuan.  That's right.  What school does he go to?

13  A    He goes to Faith Family Charter School.

14  Q    Okay.  And is he involved in the band there?

15  A    Yes, he is.

16  Q    What does he play?

17  A    The biggest drum.  I don't know what you call it.  I'm not

18  familiar with it.

19  Q    All right.

20  A    But it's the biggest drum.

21  Q    Would Mr. Clark know?

22  A    Yeah, he would know.

23  Q    Yeah.  Does Mr. Clark help out with that band program?

24  A    Yes, he does.  He's part of the fundraiser.

25  Q    Okay.  And it's a small school, right?

1   A    Correct.

2   Q    So they don't have a lot of money for the band --

3   A    No, they don't.  They just really started the band like

4   within maybe the last two years or so.

5   Q    Okay.  And he's played, really, an active role?

6   A    Yes, he has.

7   Q    Okay.  All right.  And other then obviously having just

8   lost his job for -- after being sick, --

9   A    Uh-huh.

10  Q    -- and the period when he was receiving unemployment, has

11  Mr. Clark been employed?

12  A    Yes, he has.  Before then, he worked at TAS Commercial

13  Concrete.  And before that, he worked at another job.  I can't

14  remember the name of it.  But he -- basically, he has been

15  employed basically for the last past three years.

16  Q    Okay.  And he supports the family?

17  A    Yes, he does.

18  Q    Okay.  And you and I spoke about being a third-party

19  custodian; is that correct?

20  A    Yes.

21  Q    Okay.  And I told you that a third-party custodian lives

22  with the individual?

23  A    Correct.

24  Q    And keeps an eye on him?

25  A    Correct.

L. Clark - Direct                          22

1   Q    And what did I tell you that you would have to agree to

2   do?

3   A    That I would agree that if he did any illegal anything,

4   that I would turn him in, basically.

5   Q    Right.  So if he doesn't follow any of the rules that the

6   Judge gives him, --

7   A    Correct.

8   Q    -- are you willing to --

9   A    Yes, I am.

10  Q    -- report that?

11  A    Yes, I am.

12  Q    Okay.  And are you -- are you around at home very often?

13  A    Yes.  I'm always at home.

14  Q    Okay.  And so you'll be able to actually keep an eye on

15  Mr. Clark?

16  A    Yes, I will.

17  Q    Okay.  Outside of the hours of any work he might be able

18  --

19  A    Yes, I will.

20  Q    -- to find?  All right.  And I believe, when you and I

21  spoke, you said no drugs come in your house?

22  A    No.  No drugs come in my house.

23  Q    Okay.  All right.

24          MS. MORGAN:  Nothing further.  Wait.  She gets to ask

25  questions as well.

1          THE WITNESS:  Oh.

2          MS. GUY:  May I proceed, Your Honor?

3          THE COURT:  You may.

4                      CROSS-EXAMINATION

5    BY MS. GUY:

6    Q    Do you go by Clark?

7    A    Yes, ma'am.

8    Q    Okay.  Do you work?

9    A    Well, I was working up until October of the last year.

10   Q    October 2018?  Where were you working?

11   A    At Stitch Fix.

12   Q    How long did you work there?

13   A    Approximately six months.

14   Q    Where were you working prior to that?

15   A    Gurley Home Health Care.

16   Q    For how long?

17   A    For three years.

18   Q    You indicated that your husband was working for Merritt

19   Landscaping for two weeks.

20   A    Correct.

21   Q    And then for how long was he unemployed?

22   A    The length of time that he was getting his unemployment

23   checks, I guess around about eight months.  I'm really not

24   sure how long he got the checks.  I think it was like eight

25   months.

1    Q    You said he was supporting you guys, though?

2    A    Yes.

3    Q    How was he supporting you during the period of

4    unemployment?

5    A    He would use his unemployment check to provide whatever it

6    is that we needed.

7    Q    And prior to being unemployed, where was he working?

8    A    TAS Commercial Concrete.

9    Q    And how long did he work there?

10   A    Ooh, like a couple of years.

11   Q    Okay.  Now, you talked about your daughter and how close

12   she is to him.  Where is your daughter right now?

13   A    She's with my sister.

14   Q    And where does your sister live?

15   A    Like maybe four blocks up the street from me.

16   Q    So she's close by?

17   A    Uh-huh.  Yes.

18   Q    Okay.  And your daughter is familiar with her?

19   A    Yes.

20   Q    And you talked about him taking her to school.  Do you

21   ever take your daughter to school?

22   A    We -- sometime we go together.

23   Q    Are you available to take her to school?

24   A    Yes, I am.

25   Q    Are you working right now?

1   A    No, I'm not.  I'm tending to my daughter.

2   Q    Do you have a vehicle?

3   A    I have the vehicle that they left that they confiscated

4   the merchandise out of.

5   Q    What vehicle do you have that's left?

6   A    The 2007 Mercedes.

7   Q    Did you have any other vehicles?

8   A    Well, I had a Jaguar that they confiscated.

9   Q    Any other vehicles?

10  A    No.  A Chevy Camaro that we both bought over five years

11  ago.

12  Q    Okay.  So you say that you still have the Mercedes?

13  A    Yes.

14  Q    Okay.  And does your husband use drugs at all?

15  A    No.

16  Q    And what about you?  Do you use any drugs?

17  A    Well, to be honestly, I've used marijuana in the past, but

18  right now, no, I'm not using any drugs.

19  Q    What's the past?

20  A    I guess you could say like over a year.

21  Q    Okay.  Were you involved in the distribution of any

22  controlled substances?

23  A    Ten years -- I mean, 2008, well, ten years ago, me and a

24  friend was riding in a car, and I got possession -- I got a

25  possession charge of a controlled substance.

1   Q    Were you involved in the distribution of the pills that

2   were found at your house?

3   A    No, I wasn't.

4   Q    So, if officers saw you conducting hand-to-hand

5   transactions, you're saying you weren't doing any drug deals?

6   A    I wasn't doing any drug deals.

7   Q    Did he ever ask you to deliver anything?

8   A    No, he hasn't.

9   Q    Did you know he was selling pills or doing pills?

10  A    No, I -- no, I didn't.

11  Q    So he was able to keep that from you?

12  A    Basically.  He's a man.  They can keep a lot of things

13  from us.

14  Q    And you've been with him for 20 years?

15  A    Yes.

16  Q    Did you know he was on probation?

17  A    Yes.  I knew he was on probation.

18  Q    And do you know about his criminal history and the number

19  of prior convictions that he has?

20  A    Yes.  I know about them.

21  Q    So you know he's been convicted for possession of

22  marijuana?

23  A    Yes.

24  Q    Credit card abuse?

25  A    Yes.

1    Q    Evading arrest?

2    A    Yes.

3    Q    You know he actually was sentenced to the penitentiary for

4    manufacture and delivering a controlled substance, and also

5    possession of a controlled substance?

6    A    Yes, but all those charges were caught with -- when he

7    caught those charges, I was nowhere around.  He was caught

8    with those charges in the streets.  So I wouldn't -- I

9    couldn't really tell you anything about those charges.

10   Q    So, once again, he was doing stuff that you didn't know

11   anything about?

12   A    Right.  But as I say, he wasn't at home.  He was in the

13   street.  So I wouldn't know.

14            MS. GUY:  Okay.  Nothing further, Your Honor.

15            THE COURT:  Anything else, Ms. Morgan?

16            MS. MORGAN:  Just very quickly.

17                        REDIRECT EXAMINATION

18   BY MS. MORGAN:

19   Q    When you talk about him being in the streets versus him

20   being at home, --

21   A    Right.

22   Q    -- is that -- or, what -- is that language you're using to

23   describe a lifestyle that he led at a certain period?

24   A    No, no.  I'm saying when he caught those charges, he was

25   like in a car or somewhere else.  He wasn't at home.  So I

1  couldn't give you any information on what went on at that time

2  when he caught those charges.  I know he caught those charges

3  because I know he went to jail.

4  Q    Right.  Where does Mr. Clark spend most of his time these

5  days?

6  A    At home with me.

7  Q    Okay.

8         MS. MORGAN:  Nothing further.  Oh, actually, one just

9  quick question.

10  BY MS. MORGAN:

11  Q    Just, who else is here?

12  A    His mother.  His grandmother.  His two sisters.  My best

13  friend.

14  Q    Okay.  All right.  Thank you.

15         THE COURT:  Anything else, Ms. Guy?

16         MS. GUY:  No, Your Honor.

17         THE COURT:  You may step down.  Thank you very much,

18  Ms. Clark.

19      (The witness steps down.)

20         MS. MORGAN:  No other evidence, Your Honor.

21         THE COURT:  All right.  Let's hear argument.

22         MS. GUY:  Your Honor, the Defendant in this case has

23  been charged with a very serious crime.  You heard the

24  testimony today of the special agent indicating that they

25  found approximately 8,000 pills of Fentanyl, a very serious

1   drug, very highly-addictive drug, and a drug the causes

2   overdoses.

3        You also heard, Your Honor, that they interviewed the

4   Defendant and he admitted to distribution of the pills,

5   admitted to selling them for $4 each.

6        You also heard testimony from the agent, Your Honor, that

7   the Defendant has a criminal history, and also that's

8   documented in the Pretrial Services report.  His criminal

9   history goes all the way back to 1997, when he picked up his

10  first possession of marijuana case.  When you look at that

11  criminal history documented in the Pretrial Services report,

12  you will see that he has 12 convictions, Your Honor.  Two of

13  those have been for felony drug cases.  And he is currently on

14  probation for evading arrest and tampering with evidence, Your

15  Honor.

16       The Defendant in this case is a danger to the community,

17  Your Honor, for the fact that he is dealing in a very serious

18  drug, and very large quantities, and also the fact that he has

19  a very extensive criminal history, ranging from all sorts of

20  violations of the law.  Possession of marijuana, failure to

21  ID, credit card abuse, evading, manufacture and delivering a

22  controlled substance, driving while license suspended,

23  possession of a controlled substance, bribery.  And then the

24  two cases that he's on probation for right now.

25       The Government submits that the Government has proven that

1  the Defendant committed the offense, that there is probable

2  cause to believe that he was involved in the conspiracy to

3  possess with the intent to distribute, and also distribute a

4  controlled substance.

5       So, the Government submits, Your Honor, that the Defendant

6  needs to be held pending his trial because there is not a set

7  of conditions or a condition that will ensure the safety of

8  the community, Your Honor, and ensure that the Defendant will

9  make his appearances in court.

10       Thank you.

11            THE COURT:  Ms. Morgan?

12            MS. MORGAN:  Yes, Your Honor.  Briefly, Mr. Clark is

13  certainly not a flight risk.  There's no indication that he

14  is.  A criminal history shows he does appear for court.  He's

15  a lifelong Dallas resident.  His family is here.  He has no

16  passport.  I don't believe there's much to argue about whether

17  he's a flight risk, which is probably why the Government

18  didn't address it.

19       The second issue would be whether he's a danger to the

20  community.  And the Defense would argue that, while certainly

21  controlled substances can pose a danger, those have been

22  removed from the equation here.  And there are certainly

23  conditions that Your Honor can put in place to help ensure the

24  safety of the community, including GPS, including the

25  imposition of third-party custodianship under Ms. Clark's

1   supervision.

2       Mr. Clark has a lot going on at home.  The family has a

3   lot with their youngest daughter.  And in speaking with both

4   of them, it is the first thing that comes out of either of

5   their mouths, is their concern for her and the intensive

6   amount of care and caring that she requires.  And a pre-verbal

7   three-year-old with many challenges is certainly going to

8   struggle with the loss of her person.  And she is significant

9   motivation for Mr. Clark to do what he needs to do to satisfy

10  the Court's requirements, to stay out of trouble, to report to

11  court, to report to Pretrial Services, and to ensure that he's

12  doing nothing that a third-party custodian would have to

13  report on.  Mr. Clark does not have a history of violence.

14      And for all of these reasons, we would urge you to

15  consider imposing restrictions on Mr. Clark's liberty but

16  allow his release during the pendency of this case.  Thank

17  you.

18          THE COURT:  Mr. Clark, if you would please stand.

19      Mr. Clark, based on the testimony concerning the drug

20  seizure at your residence and your admissions, I do find that

21  there is probable cause.  So you will have to go further in

22  the proceedings to faces charges.

23      On the issue of detention, because of the type of charges

24  against you, there is a presumption, which is rebuttable, that

25  there are no conditions I can set that will assure either your

1    appearance in court or the safety of the community.  It does

2    not take much evidence to rebut this presumption, but even

3    when rebutted the Court must still consider Congress' finding

4    that drug dealing poses dangers to the community.

5         What I have here before me is a significant criminal

6    history of at least four prior drug convictions, failures to

7    ID, two evading arrests.  You are currently on probation, and

8    then you've got additional convictions for credit card abuse

9    and bribery.  The four prior drug convictions are significant

10   to me, as is the fact that you are currently on probation.

11   You are on state probation and in possession, according to the

12   testimony before me, of a significant quantity of drugs, which

13   means that you were not following the conditions of your

14   probation for a prior, less serious -- arguably less serious

15   offense.  And that tells me that the Government has met its

16   burden to show me by clear and convincing evidence that there

17   is a danger to the community here based on continued drug

18   activity and continued criminal activity while on probation

19   for another offense.

20        So, I do find the Government has met its burden and I am

21   remanding you to the custody of the Marshal pending any

22   further proceedings in this case.  I am very sorry that your

23   daughter will miss you.  I understand that your attorney has

24   argued that she is motivation for you to follow the

25   conditions.  But that motivation was there when you were

1    placed on probation back in November of last year for these

2    other offenses.  So I can't find that that's sufficient here,

3    even if it was a factor that was listed in the statute for me

4    to consider.

5        Good luck to you, Mr. Clark, and to your family.

6        We are adjourned, and counsel are excused if they have no

7    further matters before the Court.

8            MS. GUY:  Thank you, Your Honor.

9            THE CLERK:  All rise.

10       (Proceedings concluded at 3:17 p.m.)

11                        --oOo--

12

13

14

15

16

17

18

19

20                    CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the digital sound recording of the proceedings in the above-
22   entitled matter.

23    **/s/ Kathy Rehling**                        **04/11/2019**

24   _____        _____

25   Kathy Rehling, CETD-444                        Date
     Certified Electronic Court Transcriber

INDEX

PROCEEDINGS                                                          2

WITNESSES

| Government's Witnesses | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Derek Hubert | 2 | 7 | 12 | 13 |

| Defendant's Witnesses | Direct | Cross | Redirect |
|---|---|---|---|
| Leunie Deshune Clark | 15 | 23 | 27 |

EXHIBITS

-none-

RULINGS                                                             31

END OF PROCEEDINGS                                                  33

INDEX                                                               34